# KATZMELINGER

280 MADISON AVENUE, SUITE 600
NEW YORK, NEW YORK 10016
www.katzmelinger.com

| | |
|---|---|
| Katherine Morales | t: 212.460.0047 |
| Katz Melinger PLLC | f: 212.428.6811 |
| | kymorales@katzmelinger.com |

January 7, 2022

**Via ECF**
The Honorable Andre M. Espinosa
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

      Re:    *Efrain Morales, et al., v. Aqua Pazza LLC d/b/a Fin Raw Bar and Kitchen, et al.,*
              **Civil Action No. 2:20-cv-06690-MCA-AME**

Your Honor:

      We are attorneys for the plaintiffs, Efrain Morales, Marco Tulio Morales, and Freddy Antonio Morales ( collectively, "Plaintiffs"), and write jointly with counsel for defendants, Aqua Pazza LLC d/b/a Fin Raw Bar and Kitchen ("Aqua Pazza"), Fin Oyster and Cocktail Bar ("Fin Oyster"), Essex Restaurant Group LLC d/b/a the Crosby ("Essex"), and Robert Gaccione ("Gaccione") (collectively, "Gaccione Defendants") to seek approval of their agreement to settle Plaintiffs' claims against Gaccione Defendants, which include claims for minimum wage and overtime violations pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a(4) ("NJWHL"); and failure to timely pay wages pursuant to the New Jersey Wage Payment Law ("NJWPL"). Plaintiffs and Gaccione Defendants respectfully request that the Court approve their settlement agreement, a copy of which is attached hereto as **Exhibit 1**, and allow them to discontinue Plaintiffs' claims against Gaccione Defendants only with prejudice pursuant to Fed. R. Civ. P. 41 (a)(2).

      The parties note that the default provision of the settlement agreement (provision 6) provides that in the event Gaccione Defendants fail to timely deliver the settlement payment and fail to cure said default within the cure period provided under the settlement agreement, Plaintiffs shall request that this Court enter judgment against Gaccione Defendants in the amount of $125,000.00. The parties believe that this is the most economical manner of handling an uncured default of the settlement agreement. The parties further note that as of the date of this letter, Plaintiffs' claims against Salute Brick Oven Pizza ("Salute"), Pier Village Stingray LLC ("Pier Village"), and Girolamo Cerrigone ("Cerrigone") (collectively, "Cerrigone Defendants") are still pending. Plaintiffs filed a motion for default judgment against Cerrigone Defendants on October 25, 2021. Dkt. Nos. 64-69.

1. **Summary of Plaintiffs' Claims**

This matter arises out of Plaintiffs' employment with Gaccione Defendants and Cerrigone Defendants. Plaintiffs claim that they were jointly employed by Gaccione Defendants and Cerrigone Defendants, and that Aqua Pazza, Fin Oyster, Essex, Salute, and Pier Village (the "Restaurants") operated as a single enterprise. Specifically, Plaintiffs allege that the Restaurants engage in the same activities, share common ownership, and have a common business purpose. Plaintiffs further allege that the Restaurants jointly market and promote each other and share supplies and employees. As further discussed below, Plaintiffs allege that during their employment, Gaccione Defendants and Cerrigone Defendants failed to properly compensate them in violation of the FLSA, NJWHL, and NJWPL.

Plaintiff Efrain alleges he worked for Cerrigone Defendants and Gaccione Defendants as a cook from in or around 2014 until on or around July 25, 2019. Plaintiff Efrain claims that from in or around 2014 until on or around July 6, 2018, he primarily worked at Aqua Pazza; however, during this period, he was also required to work at Essex and Fin Oyster. During this period, Plaintiff Efrain claims that he worked approximately 55 hours per week. From on or around July 6, 2018 until on or around July 25, 2019, Plaintiff Efrain claims he worked at Pier Village. During this period, Plaintiff Efrain claims that other than the months of December, January, and February (the "Winter Months"), he worked approximately 78 hours per week, and that during the Winter Months, he worked an average of 39 hours per week. Although Plaintiff Efrain regularly worked in excess of 40 hours per week, he was not paid overtime wages at a rate of 1.5 times his hourly rate of pay for all hours worked in excess of forty (40) per week. Specifically, Plaintiff Efrain alleges that he was paid $850.00 per week from in or around 2014 until on or around July 6, 2018; and $1,100.00 per week from on or around July 6, 2018 until on or around July 25, 2019, except from in or around February 2019 until in or around April 2019, when Plaintiff Efrain alleges he was not paid any wages.

Plaintiff Marco alleges he worked for Cerrigone Defendants and Gaccione Defendants as a cook from in or around June 2017 until on or around July 25, 2019. From in or around June 2017 until on or around July 6, 2018, he primarily worked at Aqua Pazza; however, during this period, he was also required to work at Essex. During this period, Plaintiff Marco claims that he worked approximately 55 hours per week. From on or around July 6, 2018 until on or around July 25, 2019, Plaintiff Marco claims he worked at Pier Village. During this period, Plaintiff Marco claims that other than the Winter Months, he worked approximately 78 hours per week, and that during the Winter Months, he worked an average of 39 hours per week. Although Plaintiff Marco regularly worked in excess of 40 hours per week, he was not paid overtime wages at a rate of 1.5 times his hourly rate of pay for all hours worked in excess of forty (40) per week. Specifically, Plaintiff Marco alleges that he was paid $525.00 per week from in or around June 2017 until on or around January 14, 2018; $600.00 per week from on or around January 15, 2018 until on or around July 5, 2018; and $700.00 per week from on or around July 6, 2018 until on or around July 25, 2019, except from in or around February 2019 until in or around April 2019, when Plaintiff Marco alleges he was not paid any wages.

Plaintiff Freddy alleges he worked for Cerrigone Defendants and Gaccione Defendants as a cook from in or around January 2016 until on or around July 25, 2019. From in or around January

2016 until on or around July 6, 2018, Plaintiff Freddy alleges he worked at Salute. During this period, Plaintiff Freddy claims that he worked approximately 65 hours per week. From on or around July 6, 2018 until on or around July 25, 2019, Plaintiff Freddy worked at Pier Village. During this period, Plaintiff Freddy claims that other than the Winter Months, he worked approximately 78 hours per week, and that during the Winter Months, he worked an average of 39 hours per week. Although Plaintiff Freddy regularly worked in excess of 40 hours per week, he was not paid overtime wages at a rate of 1.5 times his hourly rate of pay for all hours worked in excess of forty (40) per week. Specifically, Plaintiff Freddy alleges that he was paid $400.00 per week from in or around January 2016 until in or around April 2017; $500.00 per week from in or around May 2017 until in or around June 2017; $550.00 per week from in or around July 2017 until on or around July 5, 2018; $750.00 per week from in or around July 6, 2018 until in or around December 2018; and $800.00 per week from in or around January 2019 until on or around February 1, 2019. From on or around February 2, 2019 until on or around July 25, 2019, although Plaintiff Freddy was supposed to be compensated with $900.00 per week, Plaintiff Freddy was not paid any wages from on or around February 2, 2019 until in or around April 2019. Moreover, from in or around May 2019 until on or around July 25, 2019, Plaintiff Freddy was only paid $750.00 out of the $900.00 that was due to him per week.

### 2. Gaccione Defendants' Position

The Gaccione Defendants deny Plaintiffs' allegations and specifically deny any violations of the FLSA, NJWHL and deny that the Gaccione Defendants' failed to timely pay Plaintiffs' wages pursuant to the NJWPL. The Gaccione Defendants also dispute each Plaintiff's factual allegations alleging that Plaintiffs performed services for the various Defendants at the locations, dates and times alleged. Furthermore, the notion that the Gaccione Defendants would be found to be a single enterprise with Defendants Salute, Pier Village Stingray LLC d/b/a Fin Long Branch is also disputed. Defendants also argue that Plaintiffs' claims are subject to the two (2) year statute of limitations applicable to un-intentional FLSA alleged violations, not a three year statute of limitations as alleged in the Complaint.

Notwithstanding the fact that all parties continue to believe in the merits of their respective claims and defenses, given the time and expenses associated with costs of discovery in a multi-party litigation coupled with the uncertainty of motion practice and trial, the risk of significant delay, the ability to collect a judgment if one is obtained, the continued state and outlook of the restaurant industry during the pandemic and the present ability of Defendant to pay a settlement in one lump sum, the parties agree that a compromise consisting of the proposed payment schedule is appropriate at this stage of the litigation. The parties seek to resolve a portion of this case as to the non-defaulting parties by way of a negotiated settlement payment via lump sum, in exchange for the release of claims by Plaintiffs in order to avoid the time and expense inherent in continued litigation.

Plaintiffs and Gaccione Defendants engaged in extensive settlement negotiations since the commencement of this matter, and ultimately reached an agreement to settle Plaintiffs' claims against Gaccione Defendants for $90,000.00 to be paid to Plaintiffs in one lump-sum payment shortly after the Court's approval of the parties' settlement agreement. While Plaintiffs and Gaccione Defendants continue to express opposing views on the likely outcome of this matter,

they understand that the factual issues in this matter would likely require a trial, and that each of them would expend significant time and costs to prepare for trial. With such uncertainty on both sides, the risk to Gaccione Defendants of a substantial judgment against them, and the risk to Plaintiffs of failing to prevail on all of their claims, the amount agreed to by Plaintiffs and Gaccione Defendants represents a fair and reasonable settlement at such an early stage of the litigation.

As explained in further detail below, the parties respectfully aver that the proposed settlement agreement is fair, reasonable, and equitable.

### **The Proposed Settlement Should Be Approved**

1. The Settlement Resolves Bona Fide Disputes and is Fair and Reasonable to Plaintiff

To approve an FLSA settlement agreement in the Third Circuit, the court must determine whether "the compromise reached is a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Davis v. Essex Cty.*, 2015 WL 7761062, at *2 (D.N.J. Dec. 1, 2015) (internal quotations and citations omitted). "In determining whether the compromise resolves a bona fide dispute, the Court must be reassured that the settlement 'reflect[s] a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching,' and the bona fide dispute must be determined to be one over 'factual issues' not 'legal issues such as the statute's coverage or applicability.'" *Brumley v. Camin Cargo Control, Inc.,* 2012 WL 1019337, at *2 (D.N.J. Mar. 26, 2012) (citations omitted). District courts in the Third Circuit typically consider the factors set forth in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975) in determining whether a FLSA settlement is fair and reasonable. *Cruz v. JMC Holdings, Ltd.*, 2019 WL 4745284, at *4 (D.N.J. Sept. 30, 2019). Those factors are: "...(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ...." *Id.* (citing *Girsh*, 521 F.2d at 157).

The proposed settlement agreement reflects a reasonable compromise of bona fide disputes regarding Plaintiffs' claims, rather than a mere waiver of statutory rights brought about by Gaccione Defendants' overreaching. Here, there is no doubt that the settlement did not come about because of "overreaching" by Gaccione Defendants. To the contrary, Plaintiffs are represented by competent counsel, and the settlement amount $90,000.00 results in a recovery to Plaintiffs of $58,092.16*,* after expenses and proposed attorneys' fees. This sum is fair and reasonable given the early stage at which the settlement was reached; the time and costs associated with continued ligation; the risk that Plaintiffs will not prevail on all of their claims after a trial; and the fact that Plaintiffs will receive the entire settlement amount shortly after the Court's approval of the settlement agreement.

Moreover, the parties have engaged in extensive negotiations and, through informal discovery, gathered and exchanged information relevant to the claims and defenses in this matter;

and can therefore accurately assess the strengths and weaknesses of the asserted claims and their respective positions. *Cruz*, 2019 WL 4745284, at *5 (concluding that the parties appreciated the merits of the case because, *inter alia*, the parties engaged in informal discovery of relevant documents and various arm's-length negotiations). Although the parties hold opposing views on the merit and value of Plaintiffs' claims, the arm's length bargaining between such represented parties, along with the information shared uncovered through informal discovery, weigh in favor of finding the settlement reasonable.

### 2. The Settlement Furthers the Implementation of the FLSA

As further explained above, Plaintiffs and Gaccione Defendants hold opposing views on the merit and value of Plaintiff's claims. By reaching a settlement with Gaccione Defendants, Plaintiffs avoid the risks of either receiving an unfavorable outcome in this matter or, if Plaintiffs prevail in their claims, attempting to enforce a judgment. Furthermore, the agreement provides that Plaintiffs will receive the entire settlement amount in one lump sum payment shortly after the Court's approval of the proposed settlement agreement, which is highly favorable to Plaintiffs.

Lastly, the proposed settlement agreement between Plaintiff and Gaccione Defendants is devoid of any provisions that would frustrate the implementation of the FLSA. Specifically, the proposed agreement does not contain a confidentiality provision, and Plaintiff's release of claims is limited to the claims asserted in in the instant action. *Cruz*, 2019 WL 4745284, at *7 (finding that the proposed agreement did not frustrate the purposes of the FLSA where the agreement did not contain a confidentiality provision and the release was limited to claims asserted in the lawsuit). Furthermore, the proposed agreement contains a mutual non-disparagement provision and makes clear that such provision will not preclude the parties from disclosing information regarding this action or the parties' proposed settlement agreement.

### 3. Plaintiffs' counsels' fees are reasonable

Plaintiffs and their counsel maintain that the proposed amount of attorneys' fees is also fair and reasonable. "[T]he percentage-of-recovery method has been accepted as an established approach to evaluating the award of attorneys' fees in the Third Circuit." *Brumley*, 2012 WL 1019337, at *9. Under the percentage-of-recovery method, fee awards ranging from 19 percent to 45 percent of the settlement fund have been deemed reasonable. *Id.* at *12; *see also, Davis*, 2015 WL 7761062, at *5. Under the proposed agreement between Plaintiffs and Gaccione Defendants, Plaintiffs' counsel would recover $2,861.76[1] as reimbursement for costs and expenses, and $29,046.08 in fees. Under Plaintiffs' contingency fee agreement, Plaintiffs' counsel is entitled to recover out of Plaintiffs' settlement amount fees totaling one-third of any amounts recovered on behalf of Plaintiffs, as well as costs and expenses, which is reasonable. *Brumley,* 2012 WL 1019337, at *12 ("Counsel's request for one-third of the settlement fund falls within the range of reasonable allocations in the context of awards granted in other, similar cases").

Moreover, a lodestar crosscheck also supports Plaintiffs' counsel's fee request. As indicated by Plaintiffs' counsel's time records, attached hereto as **Exhibit 2**, Plaintiffs' counsel

---

[1] The costs and expenses are as follows: $400.00 for the filing fee; $1,280.00 in process server fees; $1,139.28 in translation fees; and $42.48 in fees for child support judgment searches.

has spent a total of 144.1 hours on this matter as follows: Kenneth Katz, 2 hours; Nicole Grunfeld, 2.7 hours; Adam Sackowitz, 6.4 hours; and Katherine Morales, 133 hours. Plaintiffs' counsels' hourly rates - $425.00, $375.00, $300.00, and $275.00, respectively – are reasonable based on their experience and are in line with the rates charged by attorneys in this district. *Santiago v. Lucky Lodi Buffet Inc.*, 2016 WL 6138248, at *4 (D.N.J. Oct. 21, 2016) (approving an hourly rate of $450.00 per hour for a law firm partner and $375.00 per hour for an associate with approximately 4 years of employment law experience); *see also*, *Jian Zhang v. Chongqing Liuyishou Gourmet NJ Inc*, 2019 WL 6318341, at *4 (D.N.J. Nov. 26, 2019) (approving an hourly rate of $550.00 per hour for a law firm partner and $350.00 for a managing associate); *see also, Punter v. Jasmin Int'l Corp.,* 2014 WL 4854446, at *7 (D.N.J. Sept. 30, 2014) (approving an hourly rate of $300.00 per hour for an associate with "over two years of litigation experience and a substantial portion of his practice relates to representation of employment matters").

Mr. Katz is the sole member of Katz Melinger PLLC, a boutique firm with substantial experience representing plaintiffs in wage and hour matters.  Mr. Katz earned his B.A. in 2000 from the State University of New York at Albany, and his J.D. in 2003 from Hofstra University School of Law, with an award recognizing his achievements in the employment law field.  Mr. Katz was admitted to practice in the courts of New York in 2004 and New Jersey in 2016, and has focused his practice in litigation since 2003.

Nicole Grunfeld is the senior associate at the Firm. Ms. Grunfeld earned her B.A. from Yale University and her J.D. from New York University School of Law, where she was an Articles Selection Editor for the NYU Review of Law and Social Change, and where she was awarded the Vanderbilt Medal for Outstanding Contributions to the law school. She has been with the Firm for more than eight years and has been a member in good standing of the New York Bar since 2005. She has focused her practice on plaintiffs' employment law for more than 13 years, and currently serves as Vice President of the Board of the New York chapter of the National Employment Lawyers' Association.

Adam Sackowitz is an associate at the Firm. Mr. Sackowitz earned a B.S. from Cornell University and a J.D. from UCLA School of Law, where he was a Managing Editor of the Journal of International Law & Foreign Affairs. Mr. Sackowitz has been a member in good standing of the New York Bar since 2015 and of the New Jersey Bar since 2016.

Katherine Morales is an associate at the Firm. Ms. Morales earned her B.B.A. from Pace University in 2014 and her J.D. from Georgetown University Law Center in 2017. Ms. Morales was admitted to practice in New York in 2018 and New Jersey in 2020. Prior to joining the firm in 2017, Ms. Morales also worked on various employment law matters while maintaining part-time positions with private law firms, universities, and nonprofits.

The $29,046.08 fee sought by Plaintiffs' counsel is below Plaintiffs' counsel's "lodestar" amount of $40,357.50. Moreover, as Plaintiffs voluntarily agreed, both at the time of settlement and at the initial engagement of counsel, to a one-third fee arrangement, Plaintiffs' counsel's fees should be found reasonable. *Davis*, 2015 WL 7761062, at *5 (finding that a lodestar crosscheck supported counsel's fee request as the lodestar amount exceeded the fee sought by plaintiff under their agreement); *see also*, *Brumley*, 2012 WL 1019337, at *12.

Accordingly, Plaintiffs and Gaccione Defendants respectfully request judicial approval of their proposed settlement agreement, and further request permission to submit a stipulation of discontinuance with prejudice as to Gaccione Defendants consistent with the requirements of Fed. R. Civ. P. 41(1) (a) (ii).

Respectfully submitted,

| | |
|---|---|
| By: */s/ Katherine Morales* <br> Katherine Morales, Esq. <br> KATZ MELINGER PLLC <br> 280 Madison Avenue, Suite 600 <br> New York, New York 10016 <br> T: (212) 460-0047 <br> kymorales@katzmelinger.com <br> *Attorneys for Plaintiffs* | By: */s/ Daniel Santarsiero* <br> Daniel M. Santarsiero, Esq. <br> LUM, DRASCO & POSITAN LLC <br> 103 Eisenhower Parkway <br> Roseland, New Jersey 07068 <br> T: (973) 228-6780 <br> dsantarsiero@lumlaw.com <br> *Attorneys for Defendants Aqua Pazza LLC, Fin Oyster and Cocktail Bar, Essex Restaurant Group LLC, and Robert Gaccione* |